IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| KERRY E. SCHRUNK,<br><br>                Plaintiff,<br><br>vs.<br><br>CAROLYN COLVIN, Acting Commissioner of Social Security Administration;<br><br>                Defendant. | 8:14CV64<br><br>MEMORANDUM AND ORDER |

This matter is before the Court on the denial, initially and on reconsideration, of Plaintiff's disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act (the "Act"), 42 U.S.C. §§ 401-434, 1381-1385. For the following reasons, the ALJ's decision will be affirmed.

## PROCEDURAL HISTORY

Plaintiff Kerry E. Schrunk ("Plaintiff") applied for DIB and SSI under Titles II and XVI of the Social Security Act (the "Act"), 42 U.S.C. §§ 401-434, 1381-1385 (Tr. 253-254, 255-260). Her claims were denied initially (Tr. 103-104, 111-120), and on reconsideration (Tr. 107-108, 123-133). On December 27, 2012, following a hearing, an Administrative Law Judge Kathleen Muramoto (the "ALJ"), found that Plaintiff was not under a "disability" as defined in the Act. (Tr. 7-28.) On January 2, 2014, Social Security Administration's Appeals Council denied Plaintiff's request for review. (Tr. 1-6.) Thus, Plaintiff has exhausted her administrative remedies, and the ALJ's decision stands as the final decision of the Commissioner subject to judicial review. Plaintiff filed her Complaint with this Court on February 28, 2014.

**FACTUAL BACKGROUND**

Plaintiff alleged she became disabled on July 1, 2007, due to bipolar disorder, depression, anxiety, social anxiety, attention deficit hyperactivity disorder (ADHD), seizures, and alcohol dependence. (Tr. 253, 317.) She subsequently amended the alleged onset date to June 2, 2008. (Tr. 32, 36, 369.)

Plaintiff graduated from college with a degree in business administration, and has work experience as a receptionist, waitress, telephone interviewer, general clerk, and carpet cleaning helper. (Tr. 19-20, 44, 318, 368.) Plaintiff was twenty-six years old on the amended alleged onset date and thirty-one years old when the ALJ rendered her decision. (Tr. 21, 253.)

Prior to her alleged onset date, Plaintiff was diagnosed with Bipolar Type I Disorder. (Tr. 693.) On June 2, 2008, Plaintiff's counselor, Peggy Hammes ("Hammes"), referred Plaintiff to Dr. Joan Daughton ("Dr. Daughton") to address stabilization of her condition. (Tr. 696.) Dr. Daughton confirmed Plaintiff's Bipolar Type I Disorder, added a diagnosis of Anxiety Disorder NOS, and assessed a Global Assessment Functioning ("GAF") score[1] of 50. (Tr. 695.) On June 23, 2008, Hammes, noted that Plaintiff's symptoms had worsened since her June 2, 2008, appointment, and Hammes assessed a GAF score of 47. (Tr. 688.) Plaintiff's GAF scores remained in the 45 to 50 range through the rest of 2008. (Tr. 682, 678, 673, 654, 645.) In January and February of 2009 her GAF scores were 42 and 45 respectively. (Tr. 644, 649.)

---

[1] Clinicians use the GAF scale to assess a patient's level of psychological, social, and occupational functioning. *See Diagnostic and Statistical Manual of Mental Disorders* (*DSM-IV-TR*) 34 (4th ed. text revision 2000).

On June 11, 2008, Barbara Schuett ("Schuett") performed a consultative exam for Plaintiff. (Tr. 564-575.) The report reflected a diagnosis of bipolar disorder, delusional disorder, alcohol abuse, cannabis abuse in early full remission, bulimia nervosa, and a GAF score of 40-45. (Tr. 574.)

On September 3, 2009, Frederick Petrides, Ph.D. ("Dr. Petrides"), performed another consultative exam. (Tr. 741-746.) Dr. Petrides's report reflected a diagnosis of mild depressive reaction, no signs of a definitive personality disorder, suspected malingering, and assessed a GAF score of 65. (Tr. 745.)

On June 15, 2010, Plaintiff was treated at Douglas County Community Mental Health Center ("Douglas County") after suffering a mental breakdown. (Tr. 765; *see also* Tr. 772-78.) Loreen Riedler, M.D. ("Dr. Riedler"), chronicled that Plaintiff had been "showing poor compliance with medications and had been drinking more over the past couple of weeks and exacerbated into acute alcohol intoxication when she lost her job after not getting there Saturday morning." (Tr. 765.) Plaintiff received counseling and her medications were streamlined. (Tr. 766-67.) She was placed in a treatment program and was instructed to attend Alcoholics Anonymous ("AA") meetings. (Tr. 767.) By discharge on June 15, 2010, she was "much improved in mood and affect." (Tr. 767.) Plaintiff's admission GAF score was 24, and her discharge GAF score was 52. (TR. 765.)

Plaintiff again received inpatient treatment at Douglas County from July 6, 2010, through July 21, 2010. (Tr. 780-81; *see also* Tr. 782-83.) Tenycia Shepherd, M.D., documented that Plaintiff had been admitted pursuant to a petition due to her disorganized behavior, noncompliance with medications, and drug and alcohol use. (Tr.

3

780.) She was referred to NOVA Therapeutic Community for continued inpatient treatment. (Tr. 780.) Plaintiff was provided medications and instructed to participate in medical, substance use, or mental health treatment as needed. (Tr. 781.) Her prognosis was considered "guarded" due to her "history of noncompliance as well as poor insight into her mental illness and continued substance use." (Tr. 781.) Plaintiff was discharged with diagnoses of bipolar disorder, alcohol dependence, and marijuana abuse. (Tr. 780.) Plaintiff's GAF score was 20 upon admittance and 40 upon discharge. (Tr. 780.)

Plaintiff returned to Douglas County for outpatient treatment on July 30, 2010. (Tr. 917-18). Plaintiff was not happy with NOVA, her treatment program, and she appeared anxious and depressed. (Tr. 917). The effectiveness of her medications was rated as "fair" to "good." (Tr. 917.) Her GAF score was 44. (Tr. 918.)

On September 16, 2010, Plaintiff's Douglas County provider recorded that Plaintiff's medications had a "great!" impact upon her symptoms. (Tr. 915.) Her GAF score was 54. (Tr. 916.) Her thought processes were linear; her thought content was logical; her mood was euthymic or neutral; her insight was "ok"; and her judgment was good. (Tr. 915.) Plaintiff was discharged from NOVA on September 17, 2010. (Tr. 840.) Her discharge diagnoses were alcohol dependence and Bipolar I Disorder, and her GAF score was 55. (Tr. 840.)

On October 21, 2010, the Clinical Director of the Douglas County Community Mental Health Center, Sidney Kauzlarich, M.D. ("Dr. Kauzlarich"), issued an opinion explaining how a patient's GAF score is evaluated differently from an evaluation completed in connection with federal and state disability cases. (Tr. 1209.) Dr.

4

Kauzlarich clarified that a clinical GAF score is related to "how the person is functioning in the context of not working: when he or she does not have to contend with the demands of a full-time job." (Tr. 1209.) Dr. Kauzlarich opined that GAF scores ranging between 50 and 60 might still be incompatible with full-time employment because the question with respect to an individual's ability to work is whether the individual in question can "function independently and appropriately and effectively and on a sustained basis." (Tr. 1209). Dr. Kauzlarich postulated that an individual currently functioning at a given level might suffer an exacerbation if subjected to the stress of work. (Tr. 1209.)

On November 4, 2010, a Douglas County provider observed that Plaintiff was "a lot happier" and "sober." (Tr. 913.) Medications had "good" effects on her symptoms, and she displayed "ok" insight and good judgment. (Tr. 913.) Her GAF was rated at 55, and her prognosis was listed as "good." (Tr. 914.)

On January 20, 2011, Dan Brune ("Brune"), an A.P.R.N. at Douglas County, noted that Plaintiff was looking for work and that she remained clean and sober. (Tr. 911.) Her condition was stable, and her affect was neutral to euthymic. (Tr. 911-12.) Brune assessed a GAF score of 50-53, noting Plaintiff's improved medication compliance, mood stability, and sobriety. (Tr. 912.) Brune also began an Adderall trial for Plaintiff. (Tr. 912.)

On February 10, 2011, Brune noted that Plaintiff reported significant improvement with the Adderall trial, at least in the morning. (Tr. 908-09.) He assessed a GAF score of 53-55, noting Plaintiff's improvement with medication. (Tr. 909.)

On March 10, 2011, Brune noted that Plaintiff was looking for work. (Tr. 972.) She complained of deficient concentration and poor memory, but her sobriety continued. (Tr. 972.) Brune described Plaintiff's speech as spontaneous, her thought processes as linear, and her mood and affect as neutral to euthymic. (Tr. 972.) He assessed a GAF score of 48-50. (Tr. 973.)

On April 8, 2011, Brune drafted an opinion regarding Plaintiff's functional limitations, which Rodney Nitcher, M.D. ("Dr. Nitcher"), cosigned. (Tr. 951-953.) Brune and Dr. Nitcher opined that Plaintiff had "poor" ability to deal with work-related stresses; maintain attention and concentration; understand, remember, and carry out complex job instructions; and demonstrate reliability. (Tr. 951-52.) The form indicated that a "poor" rating reflected that the "ability to function is seriously limited but not precluded." (Tr. 951.)

On a separate form, Brune and Dr. Nitcher indicated that Plaintiff exhibited various symptoms[2] associated with depressive disorders, as well as marked restrictions in terms of social functioning, marked difficulties in concentration, persistence, or pace, and repeated episodes of decompensation. (Tr. 956-57.) They also opined that Plaintiff had a "marked" limitation in holding a job, interacting and participating in group activities, and in various categories[3] related to the ability to maintain concentration, persistence, and pace. (Tr. 959-60.) Brune and Dr. Nitcher stated that Plaintiff's

---

[2] Nine out of the eleven symptoms listed on the form were noted as present.

[3] These categories were: independent functioning, concentration, persistence in tasks, ability to complete tasks in a timely manner, ability to assume increased mental demands associated with competitive work, ability to sustain tasks without an unreasonable number of breaks or rest periods, and ability to sustain tasks without undue interruptions or distractions.

6

condition would likely deteriorate in numerous ways in stressful circumstances. (Tr. 960-61). Brune and Dr. Nitcher indicated that Plaintiff's symptoms began prior to July 2010, and that her symptoms would exist to the same degree of severity whether or not she used drugs and/or alcohol. (Tr. 962.)

On April 28, 2011, Brune recorded that Plaintiff was "now working" on a "full time" basis. (Tr. 970-71.) Nevertheless, she was stressed by her disability appeal. (Tr. 970.) He recorded her GAF score at 48-50 (Tr. 971.)

On May 23, 2012, Brune, with a co-signature from Dr. Riedler, opined that Plaintiff's condition remained "the same" as in April 2011. (Tr. 1190-91.) Brune and Dr. Riedler issued an identical statement on October 30, 2012. (Tr. 1206-07.)

On June 3, 2011, Plaintiff was assessed with a GAF score of 55. (Tr. 1180.) On July 1, 2011, she was assessed a GAF score of 53-55. (Tr. 1178.) On December 19, 2011, she was assessed a GAF score of 55-58. (Tr. 1173.)

The ALJ held an administrative hearing on November 14, 2012. (Tr. 30-102.) At the hearing, Psychological Expert, Dr. Thomas England ("Dr. England") offered testimony regarding the nature, severity, and limiting effects of Plaintiff's impairments. (Tr. 77-96.) Dr. England engaged in limited questioning of Plaintiff. Plaintiff testified that she periodically lapsed in her abstinence from alcohol and had ceased attending AA meetings (Tr. 79-81); and that she would suffer exacerbations in her symptoms approximately three days per month. (Tr. 82.) She noted, however, that her employer had been able to accommodate her mental-health related absences. (Tr. 82-83.) Plaintiff's counsel sought to provide to Dr. England a statement from Plaintiff's employer, Dustin Ourada, that corroborated her testimony, but the ALJ ruled that the

matter pertained exclusively to credibility and, thus, fell within her purview as the adjudicator. (Tr. 83-84; *see also* Tr. 275-90.)

Dr. England testified that Plaintiff displayed symptoms related to affective disorders, personality disorders, and substance addiction disorders. (Tr. 84.) More specifically, he noted diagnoses of bipolar disorder and ADHD. (Tr. 84-85, 87.) Dr. England opined that the record reflected improvement with sobriety and medication. (Tr. 86.) He then testified that Plaintiff's impairments did not meet any listing at step three because they were episodic. (Tr. 87.) Dr. England testified that Plaintiff displayed few, if any, problems related to her daily activities and social functioning. (Tr. 88-89.) He speculated that Plaintiff occasionally, if ever, manifested social limitations greater than mild-to-moderate. (Tr. 89). Turning to concentration, persistence, or pace, Dr. England opined that Plaintiff's limitations were moderate in nature, though perhaps marked during exacerbations. (Tr. 89.) He noted that Plaintiff had suffered only one episode of decompensation since the amended alleged onset date. (Tr. 89.)

With respect to Plaintiff's residual functional capacity ("RFC"), Dr. England testified that Plaintiff could perform simple, one-or-two step instructions even during periods of exacerbation. (Tr. 90). Dr. England thought Plaintiff had moderate limitations with respect to supervisors and coworkers, and that her pressures should be "minimized" with "low stress work activity." (Tr. 90-91.) He stated that Plaintiff had adequate judgment to manage "relatively simple task in a low stress environment," except perhaps during exacerbations. (Tr. 91.) He predicted that Plaintiff would not experience significant workplace changes. (Tr. 91.)

Upon cross-examination, Dr. England testified that the Douglas County GAF scores were incompatible with the disability-oriented opinions offered by the same providers. (Tr. 91-92.) Dr. England also testified that Dr. Kauzlarich's explanation of how he assessed GAF scores was a departure from the American Psychiatric Association's categories of rating and was not accepted as standard practice. (Tr. 94-95.) Dr. England also testified that Plaintiff's periods of exacerbation "could be" incompatible with the ability to perform even simple tasks, based on her testimony. (Tr. 95.) He cautioned, however, that he did not have much objective evidence substantiating such incapacity. (Tr. 95.) Dr. England acknowledged that corroborating evidence from her employer might "tend to substantiate" her allegations. (Tr. 95-96.)

## THE ALJ'S DECISION

The ALJ found that Plaintiff had severe impairments that included bipolar disorder and polysubstance dependence in early remission. (Tr. 13.) However, the ALJ found that she did not have an impairment or combination of impairments listed in or medically equal to one contained in 20 C.F.R. part 404, subpart P, appendix 1. (Tr. 13.) The ALJ determined that Plaintiff retained the RFC to perform a full range of work at all exertional levels but with the following nonexertional limitations: she can understand, remember, and carry out short and simple instructions under ordinary supervision and can use judgment appropriately for simple jobs in a low stress environment. (Tr. 15.) She can interact adequately on a superficial level with supervisors and co-workers, but direct contact with the public is limited to 50 percent of the day or less. (Tr. 15.) She can deal with changes in the workplace if they are in the same range of work experience she has. (Tr. 15.) The ALJ found that Plaintiff's impairments would not

preclude her from performing work that exists in significant numbers in the national economy, including work as an office helper, fast food worker, and collator operator. (Tr. 20-21). Consequently, the ALJ found that Plaintiff was not disabled. (Tr. 21).

## STANDARD OF REVIEW

In reviewing a decision to deny disability benefits, a district court does not reweigh evidence or the credibility of witnesses or revisit issues *de novo*. Rather, the district court's role under 42 U.S.C. § 405(g) is limited to determining whether substantial evidence in the record as a whole supports the Commissioner's decision and, if so, to affirming that decision. *Howe v. Astrue*, 499 F.3d 835, 839 (8th Cir. 2007).

"Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008). The Court must consider evidence that both detracts from, as well as supports, the Commissioner's decision. *Carlson v. Astrue*, 604 F.3d 589, 592 (8th Cir. 2010). As long as substantial evidence supports the Commissioner's decision, that decision may not be reversed merely because substantial evidence would also support a different conclusion or because a district court would decide the case differently. *Frederickson v. Barnhart*, 359 F.3d 972, 976 (8th Cir. 2004).

The Court must also determine whether the Commissioner's decision "is based on legal error." *Lowe v. Apfel,* 226 F.3d 969, 971 (8th Cir. 2000). The Court does not owe deference to the Commissioner's legal conclusions. *See Brueggemann v. Barnhart,* 348 F.3d 689, 692 (8th Cir. 2003).

## DISCUSSION

In a DIB case, the burden is on the claimant to prove that he or she has a disability. *Pearsall v. Massanari,* 274 F.3d 1211, 1217 (8th Cir. 2001). Under the Act, a disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The Commissioner has promulgated regulations outlining a five-step sequential evaluation to guide an ALJ in determining whether an individual is disabled. 20 C.F.R. § 404.1520(a)(4). The claimant will be found to have a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); *see also Bowen v. Yuckert,* 482 U.S. 137, 140 (1987).

In this case, the ALJ concluded that Plaintiff was not disabled under 216(i), 223(d), and 1614(a)(3)(A) of the Act from June 2, 2008, through the date of the ALJ's decision, December 27, 2012. (Tr. 11, 21.) Plaintiff asserts several errors in the ALJ's decision, which are addressed below.

### I. Formulation of Plaintiff's RFC

Plaintiff argues that the ALJ ignored critical parts of the Dr. England's testimony and therefore incorrectly formulated Plaintiff's RFC. The Commissioner has promulgated regulations outlining a five-step process to guide an ALJ in determining

11

whether an individual is disabled. First, the ALJ must determine whether the individual is engaged in "substantial gainful activity." If she is, then she is not eligible for disability benefits. 20 C.F.R. § 404. 1520(b). If she is not, the ALJ must consider step two which asks whether the individual has a "severe impairment" that "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). If the claimant is not found to have a severe impairment, she is not eligible for disability benefits. If the claimant is found to have a severe impairment the ALJ proceeds to step three in which he must determine whether the impairment meets or is equal to one determined by the Commissioner to be conclusively disabling. If the impairment is specifically listed or is equal to a listed impairment, the claimant will be found disabled. 20 C.F.R. § 404.1520(d). If the impairment is not listed or is not the equivalent of a listed impairment, the ALJ moves on to step four which asks whether the claimant is capable of doing past relevant work. If the claimant can still perform past work, she is not disabled. 20 C.F.R. § 404.1520(e). If the claimant cannot perform past work, the ALJ proceeds to step five in which the ALJ determines whether the claimant is capable of performing other work in the national economy. In step five, the ALJ must consider the claimant's "age, education, and past work experience." Only if a claimant is found incapable of performing other work in the national economy will she be found disabled. 20 C.F.R. § 404.1520(f); *see also Bowen,* 482 U.S. at 140–41 (explaining five-step process).

At step four and five, the Commissioner assesses the claimant's RFC. 20 C.F.R. § 404.1520(e). "RFC is defined as the most a claimant can still do despite his or her physical or mental limitations." *Leckenby v. Astrue,* 487 F.3d 626, 631 n. 5 (8th

Cir.2007). "The ALJ bears the primary responsibility for determining a claimant's RFC and because RFC is a medical question, some medical evidence must support the determination of the claimant's RFC." *Vossen v. Astrue,* 612 F.3d 1011, 1016 (8th Cir.2010). "The RFC must (1) give 'appropriate consideration to all of [the claimant's] impairments,' and (2) be based on competent medical evidence establishing the 'physical and mental activity that the claimant can perform in a work setting.'" *Partee v, Astrue,* 638 F.3d 860, 865 (8th Cir. 2011) (quoting *Ostronski v. Chater,* 94 F.3d 413, 418 (8th Cir.1996)). In determining RFC, an ALJ should consider "[m]edical records, physician observations, and the claimant's subjective statements about [her] capabilities." *Id.* (citing *Eichelberger v. Barnhart,* 390 F.3d 584, 591 (8th Cir.2004)). Plaintiff argues that the ALJ erred in formulating Plaintiff's RFC because the ALJ did not include a limitation of three absences from work per month.

An impairment is severe if it significantly limits a plaintiff's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1521. The regulations define "basic work activities" as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1521. With respect to psychological limitations, a claimant must demonstrate that the limitation affects her ability to engage in substantial gainful activity. *See Buckner v. Astrue*, 646 F.3d 549, 557 (8th Cir. 2011) (upholding a decision where the ALJ had substantial evidence supporting a conclusion that a claimant's depression and anxiety were "not severe"). Accordingly, the ALJ must evaluate a claimant's "pertinent symptoms, signs, and laboratory findings to determine whether [the claimant has] a medically determinable mental impairment(s)." 20 C.F.R. § 416.920a(b)(1). The ALJ must then determine the degree of functional limitation resulting from the impairment.

20 C.F.R. § 416.920a(b)(2).  To evaluate functional limitation, the ALJ must rate the degree of functional limitation in four functional areas: "[1][a]ctivities of daily living; [2] social functioning; [3] concentration, persistence, or pace; and [4] episodes of decompensation." 20 C.F.R. § 416.920a(c).  If the ALJ rates the degree of limitation in the first three functional areas[4] as "none" or "mild," and rates the degree of limitation in the fourth area[5] as "none," the Commissioner "will generally conclude that [the claimant's] impairment(s) [are] not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in [the claimant's] ability to do basic work activities." 20 C.F.R. § 416.920a(d)(1).

Plaintiff claims that "the Medical expert, Dr. England, felt Plaintiff's symptoms would exacerbate to the point that she would experience marked levels of impairment, preventing her from doing simple tasks and maintaining concentration on a fulltime basis three days per month." (Pl. Br., Filing No. 23 at ECF 14-15.)  Plaintiff further claims that, had the ALJ included such a limitation[6] in Plaintiff's RFC formulation, the Vocational Expert would have testified that competitive work would be impossible.

Plaintiff's argument is premised on Dr. England's alleged testimony regarding the frequency and duration of episodes of exacerbated symptoms.  However, Plaintiff mischaracterizes Dr. England's testimony.  Dr. England did state that Plaintiff would have "periods of time [where her symptoms were exacerbated] at [the marked] level."

---

[4] Activities of daily living; social functioning; and concentration, persistence, or pace.  *See* 20 C.F.R. § 416.920a(c)(3).

[5] Episodes of decompensation. *Id.*

[6] That is, a finding that on at least three days per month, Plaintiff's impairment was at the "marked" level in the essential work functions of concentration, persistence, and pace and attendance at work.

(Tr. 95.) However, Dr. England did not testify that such periods occurred on three or more days per month. With regard to the frequency and duration of such periods, Dr. England acknowledged that he did not have much objective evidence. (Tr. 95.) Dr. England agreed that *Plaintiff* testified that she experienced such periods of exacerbation on at least three days per month. (Tr. 95.) Dr. England recognized that Plaintiff's statement was her "subjective sense," rather than his own conclusion. (Tr. 95.) Thus, for Plaintiff's argument to have merit, the ALJ needed to find Plaintiff's statement credible.

During the hearing, the ALJ correctly stated that determination of Plaintiff's credibility was within her purview, rather than Dr. England's area of concern.[7] The ALJ specifically found Plaintiff not credible (Tr. 16-19), and Plaintiff has not challenged the ALJ's credibility findings on appeal. Accordingly, Plaintiff's argument fails because Dr. England's statements regarding Plaintiff's periods of marked limitations related to work absences were based on Plaintiff's own statements, which the ALJ found to be lacking credibility. The Court concludes that the ALJ's RFC formulation was not inconsistent with Dr. England's testimony.

## II. Weight Assigned to Treating Source Opinions

Plaintiff argues that the ALJ failed to give sufficient weight to the treating source opinions.[8] Defendant counters that "the ALJ supplied valid reasons, grounded in

---

[7] "Questions of credibility are for the ALJ in the first instance. If an ALJ explicitly discredits a claimant's testimony and gives a good reason for doing so, we will normally defer to that judgment." *Whitman v. Colvin*, 762 F.3d 701, 707 (8th Cir. 2014) (internal marks and citations omitted).

[8] Plaintiff refers to opinion evidence from the "psychiatric treatment team at Douglas County" as the opinion evidence at issue. (Filing No. 23 at ECF 16.) Defendant points out that Douglas County as an entity does not qualify as a treating source under 20 CFR. §§ 404.1502, 404.1513, 416.902, 416.913,

15

substantial evidence, for her view that Plaintiff's providers' opinions were inconsistent with the record as a whole." (Filing No. 24 at ECF 14.)

When analyzing a DIB claim, the ALJ must consider all relevant evidence, including medical records and medical opinions. *See* 20 C.F.R. §§ 404.1513, 404.1520, 404.1520b, 404.1527. "Generally, 'a treating physician's opinion is given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence.'" *Renstrom v. Astrue*, 680 F.3d 1057, 1064 (8th Cir. 2012) (quoting *Perkins v. Astrue,* 648 F.3d 892, 897 (8th Cir.2011)) (internal marks omitted); *see also* 20 C.F.R. § 404.1527(c)(2).

"[A] treating physician's opinion does not automatically control, since the record must be evaluated as a whole." *Renstrom*, 680 F.3d at 1064 (quoting *Perkins,* 648 F.3d at 897). "An ALJ may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." *Perkins,* 648 F.3d at 897–98 (internal quotation marks and citation omitted). The ALJ must "always give good reasons" to explain the weight given to a treating physician's evaluation. 20 C.F.R. § 404.1527(c)(2); *see also Davidson v. Astrue*, 501 F.3d 987, 990 (8th Cir. 2007). The ALJ must apply certain factors to determine what weight to give the opinion, including the length of the treatment relationship and the frequency of examination, the nature and extent of the

---

nor does the primary author of the opinions, Brune, an A.P.R.N. However, certain opinions were co-signed by Dr. Nitcher, Dr. Kauzlarich, and Dr. Riedler, who qualify as acceptable medical sources. In her decision, the ALJ referred to Plaintiff's "treating sources at Douglas County" and specifically addressed opinions issued by Brune and co-signed by Plaintiff's qualifying treating physicians. For purposes of this Order, "Douglas County opinions" will refer to those opinions that qualify as treating source opinions under 20 CFR. §§ 404.1502, 404.1513, 416.902, 416.913.

16

treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source. *See* 20 C.F.R. 404.1527(c)(2).

In this case, the ALJ gave little weight to Plaintiff's treating physicians at Douglas County. The record demonstrates that the ALJ properly considered the necessary factors in giving weight to Plaintiff's treating provider's opinions, and in determining that their conclusions were not supported by the record as a whole. The ALJ also properly considered the inconsistencies between Plaintiff's treating physicians' opinions and the record as a whole. "[A]n appropriate finding of inconsistency with other evidence alone is sufficient to discount the opinion." *Goff v. Barnhart*, 421 F.3d 785, 791 (8th Cir. 2005).

In weighing the medical evidence in this case, the ALJ gave some weight to the opinions of Dr. Petrides and consultative examiner Schuett. Schuett opined that Plaintiff had the ability to understand, remember, and carry out short and simple instructions depending on her mood, and that Plaintiff related to co-workers and supervisors and did best with less change in her environment. (Tr. 18.) Dr. Petrides opined that Plaintiff was capable of assuming an entry level job commensurate with her training and experience. The ALJ gave significant weight to Dr. England's testimony because he was a licensed psychologist, he had the opportunity to review the entire record, he had the benefit of listening to Plaintiff's testimony, and his opinion was supported by the record in its entirety. (Tr. 19.)

Plaintiff's treating sources at Douglas County opined that Plaintiff had poor ability to deal with work stress; maintain attention/concentration; understand, remember, and

carry out complex job instructions; and demonstrate reliability. These sources also reported that Plaintiff had marked difficulties in maintaining social functioning, concentration, persistence, and pace, as well as repeated episodes of decompensation. (Tr. 956-57.) The ALJ concluded that the Douglas County providers' assessments were inconsistent with the other medical evidence. The ALJ explained that she gave little weight to the Douglas County opinions because they were "not supported by the treatment notes." (Tr. 19.) Specifically, she observed that Plaintiff's GAF scores, as issued by Douglas County providers, typically ranged between 50 and 58[9] during her treatment, and that the treatment notes did not document repeated episodes of decompensation. (Tr. 19, 973, 975, 977, 1173, 1176, 1178, 1180, 1183, 1186, 1199, 1204.) Other evidence in the record is also inconsistent with the Douglas County providers' opinions including, the opinions of Dr. England, Dr. Petrides, and Schuett. The ALJ also noted that Plaintiff's lifestyle and longitudinal record did not support a finding of disability. (Tr. 16.) The ALJ's conclusions with respect to the Douglas County opinions are supported by substantial evidence in the record. Therefore, the ALJ's decision will be affirmed.

## CONCLUSION

For the reasons discussed, the Court concludes that the Commissioner's decision is supported by substantial evidence in the record as a whole and should be affirmed. Accordingly,

---

[9] The inability "to keep a job" is associated with GAF scores between 41 and 50 and the inability to work at all is a possible element of GAF scores between 31 and 40. *See* Diagnostic and Statistical Manual of Mental Disorders (DSM IV), Fourth Edition 27-37 (4th ed. text revision 2000).

IT IS ORDERED:

1. The Commissioner's decision is affirmed;

2. The appeal is denied; and

3. Judgment in favor of Defendant will be entered in a separate document.

Dated this 8th day of January, 2015.

BY THE COURT:

s/Laurie Smith Camp
Chief United States District Judge